IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| BRAINWARE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL NO. 3:11cv755-REP-DJN |
| ) | |
| SCAN-OPTICS, LTD., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

Between 2009 and 2011, Brainware, Inc. ("Brainware" or the "Plaintiff") engaged in a series of business transactions with Scan-Optics, LLC ("Scan-Optics USA") and its British subsidiary, Scan-Optics, Ltd. ("Scan-Optics UK" or, collectively with Scan-Optics USA, the "Defendants"). In one such transaction, Scan-Optics UK purchased a set of software licenses from Brainware (the "Contract"). Although Brainware delivered the licenses, Scan-Optics UK failed to pay according to the terms of the Contract for two reasons. First, Scan-Optics USA allegedly forbade payment, asserting that it had not authorized Scan-Optics UK to enter into the Contract. Second, Scan-Optics UK lacked the funding to pay its debt on its own. According to Brainware, Scan-Optics USA had pilfered its UK affiliate, depleting it of sufficient capital to satisfy its obligations.

In an effort to collect the unpaid debt, Brainware initiated this lawsuit against Scan-Optics UK, later amending its pleadings to include Scan-Optics USA as a co-defendant under a theory of alter-ego liability. Scan-Optics USA moves to dismiss for lack of personal jurisdiction and for failure to sufficiently allege that the corporate veil may be pierced. Until the parties

engaged in pre-litigation settlement discussions, Scan-Optics USA alleges that it had no involvement with the subject transaction, lacked sufficient contact with Virginia, and cannot be bound by its affiliate's Contract with Brainware. Essentially, Scan-Optics USA attempts to isolate its relationships with Brainware and Scan-Optics UK, placing the Contract in a vacuum that ignores the nature of its relationships with both entities and its alleged pilfering of its UK affiliate.

This matter is now before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Scan-Optics USA's Motion to Dismiss (ECF No. 25) and Motion for a Limited Stay of Discovery (ECF No. 35). The parties have thoroughly briefed the issues, including submission of affidavits addressing the jurisdictional facts, and the matter is now ripe for decision.[1] For the reasons set forth herein, it is the Court's recommendation that Scan-Optics USA's Motion to Dismiss be DENIED and that its Motion for Limited Stay of Discovery be DENIED as moot.

## I. BACKGROUND

When addressing a motion to dismiss for failure to state a claim, the Court must assume that all well-pleaded allegations in a plaintiff's pleadings are true and view the facts in the light most favorable to it as the non-moving party. *T.G. Slater & Son, Inc. v. The Donald P. and Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). But when addressing a motion to dismiss for lack of personal jurisdiction, the Court must also consider facts asserted in the legal memoranda, supporting affidavits, and other evidentiary sources, drawing all reasonable inferences in favor of the plaintiff. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th

---

[1] The Court dispenses with oral argument, finding the written submissions adequate for the Court to render its decision.

Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). Viewing the facts through these respective lenses, the Court considers the facts as follows.

A. **Allegations**

In February 2010, Brainware and Scan-Optics UK executed a written "Value Added Reseller Agreement" (the "Contract"). (Am. Compl. at ¶ 1.) According to the terms of the Contract, Scan-Optics UK would purchase a minimum amount of Brainware's software and annual maintenance services for a total price of approximately £1,680,000 (or $2,700,000) over a three-year period. (*Id.*) In turn, Scan-Optics UK would be authorized to resell Brainware's software licenses and associated maintenance services to its own customers. (*Id.* at ¶ 2.) Because the Contract required Brainware to disclose certain confidential information to Scan-Optics UK, it included a confidentiality provision forbidding Scan-Optics UK from disclosing such information to third-parties. (*Id.*) Although Brainware delivered its products and services as required under the Contract, Scan-Optics UK never made timely payments, the first of which was due in February 2011. (*Id.* at ¶¶ 3, 26, 30, 33, 34.)

The Contract also includes several procedural terms that govern litigation arising out of a breach. Specifically, the Contract included the following jurisdictional provision:

> This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia as those laws are applied to contracts entered into and to be performed entirely in Virginia by Virginia residents, notwithstanding the actual state or country of residence or incorporation of either party Brainware or Reseller and without regard to choice of law principles. Any legal suit, action or proceeding arising out of or relating to this Agreement shall be commenced in a court of competent jurisdiction in Virginia, and each party irrevocably submits to the personal jurisdiction and venue of such court in any suit, action or proceeding. For purposes of establishing jurisdiction in Virginia under this Agreement, each party hereby waives, to the fullest extent permitted by applicable law, any claim that: (i) it is not personally subject to the jurisdiction of such court; (ii) it is immune from any legal process with respect to it or its

property; and (iii) any such suit, action or proceeding is brought in an inconvenient forum.

Finally, the Contract provides that the prevailing party in any litigation "shall be entitled to recover its reasonable costs and expenses incurred, including attorneys' fees." (*Id.* at ¶ 32.)

Scan-Optics UK, a British limited company, is a wholly-owned subsidiary of Scan-Optics USA. (*Id.* at ¶ 4.) Throughout the relevant period, Scan-Optics USA directed and controlled its UK subsidiary to such a degree that the two companies functioned as one. (*Id.* at ¶¶ 22, 24.) In tandem with its control of its subsidiary, Scan-Optics USA routinely transferred funds from Scan-Optics UK to maintain the UK firm in a persistent thinly-capitalized state. (*Id.* at ¶ 22.) Scan-Optics UK also shared the confidential information obtained from Brainware under the Contract with Scan-Optics USA. (*Id.* at ¶ 23.)

## B. Jurisdictional Facts

The allegations set forth above arise, in part, out of ongoing business relationships involving Brainware and the Defendants. The relationships began in 2009 when Brainware contacted Scan-Optics UK about a potential business opportunity. (Aff. of Colin Kaye ("Kaye Aff.") at ¶ 5.) As negotiations continued over the subsequent months, Scan-Optics UK executed two contracts with Brainware: (1) a non-disclosure agreement; and, (2) an evaluation agreement. (*Id.* at ¶ 6.) Ultimately, in February 2010, these negotiations culminated in the execution of the Contract that is the subject of this dispute. (*Id.* at ¶ 7.) The Contract was executed by Peter Moralee ("Moralee") in his capacity as Managing Director of the UK-based firm, representing that he had full authority to do so. (*Id.* at ¶¶ 5, 8.)

Soon after execution of the Contract with Scan-Optics UK, Brainware began negotiating a direct business relationship with Scan-Optics USA. (*Id.* at ¶ 18.) In March 2010, Richard

Lieberfarb ("Lieberfarb"), CEO of Scan-Optics USA, requested an in-person meeting with Brainware's employees in Virginia. (*Id.*) This resulted in Lieberfarb sending two Scan-Optics USA employees to Virginia in April 2010 to explore an ongoing business relationship between the parties. (*Id.*) Ray Parker, Scan-Optics USA's Vice President of New Business Development, also attended by speakerphone. (*Id.*) These negotiations led to the execution of a consulting agreement in August 2010. (*Id.* at ¶ 20.) Under the terms of this consulting agreement, Scan-Optics USA sent two employees to Brainware's facility in Virginia for training between August 8 and 20, 2010. (Aff. of Neil Moses ("Moses Aff.") at ¶ 10.) Throughout the period of the consulting agreement, both of these Scan-Optics USA employees were given access to Brainware's computer network, which is located in Virginia. (*Id.* at ¶ 9.)

Thereafter, the parties negotiated three additional contracts. In July 2010, Scan-Optics USA expressed an interest in negotiating a reseller relationship with Brainware. (Kaye Aff. at ¶ 21.) Around the same time, Scan-Optics USA also sought a licensing agreement that would allow it to use Brainware's products at their data processing center. (*Id.* at ¶ 22.) Finally, in July 2010, Scan-Optics USA asked Brainware to generate a price quote for a "business process outsourcing partner relationship." (*Id.* at ¶ 23.) This would initially allow the use of Brainware's software at Scan-Optics USA's holding company, Patriarch Partners, LLC ("Patriarch"), which it could in turn license to other customers. (*Id.*)

The negotiations between Brainware and Scan-Optics USA regarding the business process outsourcing partnership specifically included rights and obligations of Scan-Optics UK. (*Id.* at ¶ 24.) Moreover, the draft agreement resulting from these negotiations included an instruction from Scan-Optics USA that Brainware should consider the "[sales order] on a global

basis [and] not per country." (*Id.*) As of March 2010, this relationship between the Virginia-based Brainware and Scan-Optics USA was characterized as a "partnership." (Aff. of David Mountcastle ("Mountcastle Aff.") at ¶ 9.)

At some point after execution of the subject Contract, Moralee informed Brainware that Scan-Optics USA routinely transfers large portions of funds from Scan-Optics UK. Also, Moralee explained that Scan-Optics USA micromanages its UK affiliate, rendering it wholly-dependent on its parent company. (Kaye Aff. at ¶ 9.) Then, when Scan-Optics UK received its first invoice under the Contract in early 2011, Moralee informed Brainware that it did not have adequate funds to make the payment. (*Id.* at ¶ 10.) As it turns out, Scan-Optics USA had not approved its subsidiary's Contract with Brainware, and so it instructed Scan-Optics UK not to pay.[2] (*Id.* at ¶ 11; Mountcastle Aff. at ¶¶ 30-32.) From this point forward, Scan-Optics USA instructed Brainware not to have any further contact with its UK affiliate concerning the Contract, instead requiring it to deal exclusively with Scan-Optics USA. (*Id.* at ¶ 12.) Ultimately, representatives of Scan-Optics USA traveled to Virginia and successfully negotiated

---

[2] Such extensive control strongly supports Brainware's alter-ego theory of liability. But even if Scan-Optics USA is correct that it is a third-party with respect to the Contract, that may instead give rise to a claim for tortious interference with a contract. In Virginia, as in England and most other jurisdictions:

> One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985); *Wyatt v. McDermott*, No. 111497, slip op. at 7-8 (Va. April 20, 2012). Because one cannot be liable for tortious interference with its own contracts, such a theory would be an alternative to veil-piercing, which instead asserts that the two entities are one in the same.

an amicable resolution that its own parent company — Patriarch Partners, LLC ("Patriarch") — then refused to honor. (*Id.* at ¶¶ 16, 17.)

Other than those contacts with Brainware, Scan-Optics USA does not appear to maintain significant contacts with Virginia. It does not maintain an office in Virginia, retain employees in Virginia, or maintain any bank accounts in Virginia. (Aff. of Tom Rice ("Rice Aff.") at ¶ 10.) It is not registered to do business in Virginia and does not hold any licensure from the state government. (*Id.*) Scan-Optics USA does not advertise or solicit business in Virginia, from which it derives a mere 0.2% of its gross annual revenue. (*Id.* at ¶¶ 10-11.)[3]

## II. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Against this backdrop, the Court will first examine whether Brainware has sufficiently alleged a claim to pierce the corporate veil that exists between Scan-Optics USA and its wholly-owned subsidiary, Scan-Optics UK. Typically, the Court would begin its analysis with the jurisdictional inquiry. But if the two entities are alter egos of one another — or at least if such is sufficiently pleaded — then the contacts of one may be imputed to the other, thereby conferring personal jurisdiction upon Scan-Optics USA pursuant to the jurisdictional waiver in the Contract. *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433-34 (4th Cir. 2011) (piercing the corporate veil under Virginia law to assert personal jurisdiction). Accordingly,

---

[3] Brainware also relies on Scan-Optics USA's 2005 lawsuit against a Virginia-based firm as a contact with the forum, because it chose to bring that lawsuit in this Court. A single contact in an unrelated lawsuit is insufficient to establish general personal jurisdiction. *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991) ("A party's consent to jurisdiction in one case . . . extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available"); *see also ESAB Group v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) ("[T]he threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction"). The 2005 lawsuit has no bearing on the issue of specific personal jurisdiction, so it shall be addressed no further.

Scan-Optics USA's motion to dismiss Brainware's alter ego claim pursuant to Fed. R. Civ. P. 12(b)(6) will be addressed first.

### A. Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater*, 385 F.3d at 841 (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Discussion

Although the Contract here includes a choice-of-law provision incorporating Virginia law, Scan-Optics USA is not bound by the terms of the Contract until the corporate veil is pierced in the first instance. *Arthur Andersen LLP v. Carlisle*, 555 U.S. 624, 631 (2009) (citation

and internal quotation marks omitted) ("[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel"). Otherwise, the parties could simply choose the law of a jurisdiction that tends to disregard corporate formalities altogether, broadly extending the contractual obligations to any number of affiliated entities. Accordingly, the Court begins its analysis with the governing choice-of-law rules.

Ordinarily, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits — Virginia in this case. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). In Virginia, "the law of the state of incorporation determines whether the corporate veil may be pierced." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 359 F. Supp. 2d 497, 501 n.6 (E.D. Va. 2005) (citing *Int'l Bancorp, LLC v. Societe Des Baines De Mer Et Due Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 477 n.18 (E.D. Va. 2002)). Because Scan-Optics UK is an English corporation, English law applies.[4] (Decl. of Tom Rice ("Rice Decl.") at ¶ 5.)

Both Brainware and Scan-Optics cite a series of English cases on the subject, none of which articulates a clear test for determining whether a particular plaintiff meets the threshold. Moreover, because the issue is raised in the context of a Rule 12(b)(6) motion, the parties have not yet had the benefit of discovery or the presentation of evidence at trial. In contrast, several of the cited English opinions were issued after a trial or evidentiary hearing. *See, e.g., Kensington Int'l Ltd. v. Congo*, [2005] EWHC 2684 (Q.B.D.); *Hashem v. Abdulhadi Ali Shayif*, [2008] EWHC 2380 [¶ 163] (Fam.). But here, the issue is solely whether Brainware's pleadings are sufficient, not whether it will be able to prove its alter ego claim after discovery and trial. Thus,

---

[4] As explained *infra* at n.5, the outcome is the same under Virginia law.

the English veil-piercing requirements must be distilled into those minimum elements necessary to satisfy federal pleading standards, not necessarily the standard of proof necessary to prevail on the merits.

This is not the first time that a federal court has addressed this issue. In *In Re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010), United States District Judge Denise Cote of the Southern District of New York examined English veil-piercing decisions, applying those rules in the context of a federal bankruptcy appeal. The *Tyson* Court narrowed English law on the issue to five specific rules, three of which provide concrete guidance for purposes of federal pleading standards. *Tyson*, 433 B.R. at 86-90. First, courts may pierce the corporate veil only where special circumstances exist indicating that it is a "mere façade concealing the true facts." *Id.* at 87. Second, a plaintiff's ability to pierce the corporate veil turns on whether the corporate structure was used to evade then-existing obligations as opposed to future obligations. *Id.* at 88. In other words, there is a temporal requirement. Finally, the corporate structure does not shield the shareholder from fraud claims, which do not require the piercing of the corporate veil. *Id.* at 89. Thus, something short of fraud may justify piercing the corporate veil.

The temporal requirement particularly distinguishes English corporate law from that applied in Virginia. *Compare Kensington Int'l Ltd. v. Congo*, [2005] EWHC 2684 (Q.B.D.) *with Dana v. 313 Freemason, A Condo. Ass'n*, 587 S.E.2d 548, 554 (Va. 2003). In *Kensington*, the High Court explained the rule further. "The corporate structure could legitimately be used [to limit] the legal liability (if any) in respect of particular *future* activities." *Id.* ¶¶ 185, 187 (emphasis added). But, "*transactions* or structures, which have no legal substance, and which

are set up with a view to defeating *existing claims of creditors* . . . can, if they are purely a sham and a façade, be treated by the court as lacking validity." *Id.* (emphasis added).

Here, the Court must apply this rule in the context of the federal "plausibility" pleading standards. *Twombly*, 550 U.S. at 570. At this stage of the litigation, Brainware is not required to provide "detailed factual allegations," but it must allege "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555 (citations omitted). The Court must assume that the allegations are true, view the complaint in the light most favorable to the plaintiff, and draw all reasonable inferences in its favor. *Matkari*, 7 F.3d at 1134; *see also Martin*, 980 F.2d at 952.

Brainware has met this standard based on three facts that it has alleged against Scan-Optics USA. First, it alleges that Scan-Optics USA "directed," "micromanaged," and controlled Scan-Optics UK such that the two companies operated as one. (Am. Compl. at ¶¶ 22, 24.) Second, it alleges that Scan-Optics USA routinely "transfer[s] significant portions of [Scan-Optics UK's funds] to" itself, "thereby leaving Scan-Optics [UK] thinly capitalized." (*Id.* at ¶ 22.) Finally, Brainware alleges that Scan-Optics UK provided the confidential information that was the subject of the Contract to Scan-Optics USA, thus giving it the benefit of the contract between Brainware and Scan-Optics UK. (*Id.* at ¶¶ 23, 41.) Viewed in the light most favorable to Brainware, this sequence of events paints a picture of Scan-Optics USA accepting the benefit of Brainware's product through its subsidiary, only to then pilfer the subsidiary to prevent Brainware from obtaining the benefit of its bargain. Construed as such, Scan-Optics USA's intent to abuse the corporate structure of Scan-Optics UK to avoid its subsidiary's already-acquired contractual obligation is exactly the sort of transaction contemplated in *Kensington*.

Ultimately, after investigation of the financial relationship between Scan-Optics USA and Scan-Optics UK through the discovery process, Brainware might not be able to meet the strictures of English veil-piercing requirements. But for purposes of a motion made pursuant to Fed. R. Civ. P. 12(b)(6), Brainware has satisfied the "plausibility" pleading standard. Thus, the Court recommends that the motion to dismiss be denied on this basis.[5]

### III. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Because the Court finds that Brainware has sufficiently alleged its alter ego theory of liability, Scan-Optics UK's contacts with the forum (and the forum selection clause of the Contract) could be imputed to Scan-Optics USA. *See Newport News Holdings Corp.*, 650 F.3d at 434. On this basis, the Court could conclude that Scan-Optics USA is bound by the Contract's choice of venue provision and jurisdictional waiver. *Id.*; (Am. Compl. at ¶ 12.) Even if this was not the case, analysis of Scan-Optics USA's contacts with Brainware in Virginia gives rise to specific personal jurisdiction in this case. Accordingly, the Court proceeds to evaluate those contacts.

#### A. Standard of Review

A motion made pursuant to Fed. R. Civ. P. 12(b)(2) challenges the court's exercise of personal jurisdiction over a defendant. "When a court's personal jurisdiction is properly

---

[5] Scan-Optics USA has also cited authority suggesting that, for jurisdictional purposes of imputing contacts, the veil-piercing law of the forum state must be applied. *See Int'l Bancorp, LLC*, 192 F. Supp. 2d at 477. But the outcome would be the same under Virginia law, because Virginia's veil-piercing standards are somewhat more forgiving than the English standards already discussed, *supra* at Section II(B). For example, Virginia permits veil-piercing when "deliberate undercapitalization" renders a company unable to satisfy a judgment. *Dana*, 587 S.E.2d at 554; *see also Newport News Holdings Corp.*, 650 F.3d 423 at 434 (discussing Virginia law). The only significant difference between English and Virginia law on the issue is that Virginia does not impose the temporal requirement. *Compare Kensington*, [2005] EWHC 2684 with *Dana*, 587 S.E.2d at 554. Accordingly, it is unnecessary to engage in separate analysis under Virginia law.

challenged . . . the jurisdictional question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) (citations omitted). If the existence of jurisdiction turns on disputed questions of fact, the court may resolve the jurisdictional challenge on the basis of a separate evidentiary hearing or at trial. *Combs*, 886 F.2d at 676. When, as here, the court is asked to decide personal jurisdiction without an evidentiary hearing, it may do so based solely on the motion papers, supporting legal memoranda, and the relevant allegations of the complaint. *Id.* If the court proceeds in this fashion, "the plaintiff need prove only a *prima facie* case of personal jurisdiction," with the court drawing "all reasonable inferences arising from the proof, and resolv[ing] all factual disputes, in the plaintiff's favor." *Id.* (ciations omitted).

### B. Discussion

To determine whether personal jurisdiction exists, a court typically engages in a two-step inquiry. *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). First, it must determine whether the state's long-arm statute authorizes the exercise of personal jurisdiction. *Id.* Second, it must assess whether such exercise of jurisdiction is constitutionally permissible. *Id.* However, the Fourth Circuit has determined that "Virginia's long-arm statute [Va. Code § 8.01-328.1] extends personal jurisdiction to the extent permitted by the Due Process Clause." *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (citation omitted). Thus, "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Id.* (citations and internal quotation marks omitted).

13

Non-resident defendants may be subject to either specific or general jurisdiction. Specific jurisdiction exists if the plaintiff's claims arise out of the defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 n.8, n.9 (1984). Alternatively, general jurisdiction depends on a defendant's contacts with the forum state unrelated to the claims at issue. *Id.* To establish general jurisdiction, a non-resident defendant's activities in the state must be "continuous and systematic," a "significantly higher" threshold of minimum contacts than is required to establish specific jurisdiction. *ESAB Group*, 126 F.3d at 623. Although Scan-Optics USA addresses the issue of general jurisdiction at length, the Court will focus its inquiry exclusively on the issue of specific jurisdiction, because the Court agrees that Scan-Optics USA's contacts with Virginia fall far short of the "continuous and systematic" threshold.[6]

To evaluate whether "minimum contacts" exist such that the exercise of specific jurisdiction comports with due process, a court must consider: (1) whether the defendant "purposefully availed" itself of the privilege of conducting activities in Virginia; (2) whether the plaintiff's claims arise out of such activities; and, (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004). No bright-line numeric test exists, as the Fourth Circuit has held that "a single act by a

---

[6] Scan-Optics USA challenges the propriety of considering the specific jurisdiction analysis, arguing that the Amended Complaint asserts only general jurisdiction. (Scan-Optics USA's Reply Br. Sup. Mot. to Dismiss ("Scan-Optics USA Reply") at 5.) Brainware's jurisdictional allegation against Scan-Optics USA is solely that "among other things, Scan-Optics USA transacts business in the Commonwealth of Virginia." (Am. Compl. at ¶ 14.) This is an apparent reference to one of the basis of jurisdiction in Virginia's long-arm statute, Va. Code § 8.01-328.1(A)(1). But as the Court has already noted, Virginia's long-arm statute is co-extensive with the limits of due process. *See Young*, 315 F.3d at 261. Indeed, the statutory provision at issue has been interpreted to permit jurisdiction as a result of a single contact — clearly invoking specific, as opposed to general jurisdiction. *See English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). Thus, the Court does not perceive any deficiency in Brainware's jurisdictional pleadings that would limit the analysis to general jurisdiction.

nonresident which amounts to 'transacting business' in Virginia and gives rise to a cause of action may be sufficient to confer jurisdiction upon [Virginia] courts." *English & Smith*, 901 F.2d at 38 (internal quotes omitted) (alteration in original).

In fact, a defendant need not be physically present in Virginia to engage in a transaction of business in the Commonwealth. *See, e.g., Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982). Nevertheless, "[a] defendant should be able to anticipate being sued in a court that can exercise personal jurisdiction over him; thus, to justify such an exercise of jurisdiction, a defendant's actions must have been 'directed at the forum state in more than a random, fortuitous, or attenuated way.'" *Mitrano*, 377 F.3d at 407 (quoting *ESAB Group, Inc.*, 126 F.3d at 625).

The Court agrees with Scan-Optics that the "'proper focus in the specific jurisdiction analysis is on those contacts leading up to and surrounding the accrual of the cause of action.'" (Def.'s Reply Sup. Mot. to Dismiss ("Def.'s Reply") at 6 (quoting 16 James Wm. Moore, *Moore's Federal Practice* § 108.42[2][a] (1997)).) But Scan-Optics USA mischaracterizes the nature of its contacts with Virginia during the relevant period. For example, it asserts that it merely "visited Virginia once in an attempt to settle [this] case." (Def.'s Reply Sup. Mot. to Dismiss ("Def.'s Reply") at 1.) Of course, this ignores the broader ongoing business relationship between the parties, which includes multiple negotiations with Brainware — a Virginia corporation — and several trips by Scan-Optics USA employees to Brainware's offices in Virginia. (Kaye Aff. at ¶ 18; Moses Aff. at ¶ 10.) Indeed, two of Scan-Optics USA's employees were eventually embedded into Brainware, to the extent that each had their own Brainware email address. (Moses Aff. at ¶ 9.)

Moreover, Scan-Optics USA's post-breach negotiations with Brainware evince the broader business relationship between the two entities that existed *before* the breach. Although these contacts themselves may not be considered for jurisdictional purposes, they serve as evidence of the ongoing business relationship that was established during the relevant period. Considering the subject Contract in the context of the ongoing business relationship between and among Brainware and the Defendants, it is evident that Scan-Optics USA has subjected itself to jurisdiction in Virginia.

1. **Purposeful Availment**

The first component of the specific jurisdiction analysis asks whether the party challenging jurisdiction has purposefully directed its activities at residents in the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985). As the Court has explained, the Contract at issue here cannot be isolated from the ongoing business relationship that was formed between Scan-Optics USA and Brainware, regardless of whether the Contract at issue was executed by its subsidiary. The nature of the business relationship, as set forth in the pleadings and affidavits, paints a picture of Scan-Optics USA actively engaging Brainware in a partnership designed for its benefit and that of *its affiliated entities*. (Kaye Aff. at ¶ 24; Mountcastle Aff. at ¶ 9.) Thus, the Contract and resulting dispute are part of a larger, ongoing business relationship between Scan-Optics USA and Brainware.

This Court has previously held that "[c]reating an ongoing business relationship with a resident of the forum state further indicates that the party has purposefully directed activities at [the] forum." *Taltwell, LLC v. Zonet USA Corp.*, No. 3:07cv543, 2007 U.S. Dist. LEXIS 93456, at *23 (E.D. Va. Dec. 20, 2007) (citing *Burger King*, 471 U.S. at 475-76; *McGee v. Int'l Life Ins.*

16

*Co.*, 355 U.S. 220, 222-23 (1957)). Together with its multiple trips to Brainware's offices and several contracts with the Virginia-based company, it is clear that Scan-Optics USA purposefully directed its business activities toward Virginia. Accordingly, the Court finds that this first prong of the jurisdictional test is satisfied.

### 2. Relationship between the Contract and the Business Relationship

For similar reasons, the Court finds that the Contract between Scan-Optics UK and Brainware is sufficiently "related to" the ongoing business relationship between Brainware and Scan-Optics USA. The requirement for jurisdictional purposes is flexible — the Contract must merely "arise out of or relate to" Scan-Optics USA's contacts with Virginia. *Burger King*, 471 U.S. at 473. Here, the Contract was formed in the context of the business partnership then-forming between Scan-Optics USA and Brainware. Indeed, Scan-Optics USA expressed an intention to form a "global" partnership in which Brainware would supply its products and services to its affiliates, including Scan-Optics UK and Patriarch. (Kaye Aff. at ¶¶ 23-24; Mountcastle Aff. at ¶ 9.) The nexus between the Contract at issue and the developing business relationship satisfies the second prong of the specific jurisdiction analysis.

### 3. Exercise of Jurisdiction is Constitutionally Reasonable

The third and final factor of the "minimum contacts" test requires the Court to ask whether its exercise of jurisdiction is "constitutionally reasonable." *Mitrano*, 377 F.3d at 407. The touchstone of this "somewhat nebulous concept," *Christian Sci. Bd. of Dirs.*, 259 F.3d at 218, is whether the exercise of jurisdiction over a defendant comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). The standard has been explained as follows:

17

> In determining whether jurisdiction is constitutionally reasonable, we may evaluate "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies."

*Christian Sci. Bd. of Dirs.*, 259 F.3d at 218 (quoting *Burger King*, 471 U.S. at 477).

In general, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Scan-Optics has offered no such "compelling case" demonstrating that an exercise of jurisdiction is unreasonable, instead focusing exclusively on the extent of its contacts with Virginia.

Regardless, the Court finds that such an exercise of jurisdiction is constitutionally reasonable under the present circumstances. The burden on Scan-Optics USA to litigate this case in Virginia appears to be minimal, especially since it is the sole financier of its co-defendant subsidiary, Scan-Optics UK. Were the Court to dismiss the case on personal jurisdiction grounds here, duplicative litigation would no doubt commence in another jurisdiction. While Scan-Optics USA might obtain a more convenient forum in the next lawsuit filed, it would still be involved in this litigation as Scan-Optics UK's financier and as a witness to many of the facts alleged in the Amended Complaint. Also, the Fourth Circuit has held that "the inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there." *CFA Inst. v. Inst. Of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009). Given the nature of the ongoing business relationship between Scan-Optics USA and Brainware, it was certainly foreseeable that Scan-Optics USA could be subject to suit

in this Commonwealth. Thus, matters of convenience do not render an exercise of jurisdiction fundamentally unfair.

For similar reasons, containing the litigation to a single matter in a single court serves the "interstate judicial system's interest in obtaining the most efficient resolution of controversies." *See Christian Sci. Bd. of Dirs.*, 259 F.3d at 218 (citing *Burger King*, 471 U.S. at 477). This simple contract dispute between the parties would splinter into at least two lawsuits — potentially more should any other affiliated companies be joined as defendants. Such an outcome runs counter to the goal of judicial efficiency that is incorporated into the analysis of constitutional reasonableness.

Finally, the forum state has a strong interest in providing a convenient forum for those corporations operating in Virginia. The Fourth Circuit has recognized that "Virginia has a valid interest in the resolution of the grievances of its citizens and businesses, particularly when they potentially involve issues of Virginia law." *CFA Inst.*, 551 F.3d at 296-97. Here, the Contract at issue specifically incorporates Virginia law. (Am. Compl. at ¶ 12.) Although Scan-Optics USA is not a party to the Contract, it may be liable thereunder if Brainware ultimately prevails on its alter ego theory of liability. Thus, considerations of the forum state's interests weigh in favor of finding the exercise of jurisdiction constitutionally reasonable.

In sum, the Court finds that Scan-Optics USA purposefully availed itself of the privilege of conducting business in Virginia, that its contacts with Virginia "relate to" the Contract at the center of this litigation, and that it is constitutionally reasonable to exercise jurisdiction over it in Virgnia. Accordingly, the Court recommends that the motion to dismiss for lack of personal jurisdiction be denied.

## IV. MOTION TO STAY DISCOVERY

The Court will not exercise its discretion to stay discovery pending resolution of the Motion to Dismiss while the Court simultaneously recommends denial of the very motion giving rise to such a stay. Indeed, one of the requirements for granting such a stay is a showing that the motion has merit. *See, e.g., Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, 236 F.R.D. 113, 115 (E.D.N.Y. 2006). Because the Court recommends denial of the Motion to Dismiss, it likewise recommends that the Motion for Stay of Discovery be denied as moot.

## V. CONCLUSION

In conclusion, and for the reasons discussed herein, it is the recommendation of this Court that Defendant Scan-Optics USA's Motion to Dismiss (ECF No. 25) and Motion for a Limited Stay of Discovery (ECF No. 35) be DENIED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne, with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ BV
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: May 9, 2012